DECISION
Defendant-appellant, the City of Columbus, Ohio ("the city"), appeals the judgment of the Franklin County Court of Common Pleas in favor of relator-appellee, McNeill Farms East Condominium Association ("McNeill Farms"). By its judgment, the court of common pleas granted a writ of mandamus ordering the city to provide ninety-gallon container refuse disposal service to McNeill Farms. The court also awarded monetary damages to McNeill Farms.
This matter initially involved four condominium communities, McNeill Farms, Hilliard Village, Hilliard Commons and Blendon Park. The condominium communities were built by the same developer. They have similar physical layouts, and they range in size from sixty-two condominium units to six hundred sixty units.
The four condominium communities historically received ninety-gallon container refuse collection service from a private refuse collection company. The condominium associations paid for this service. With ninety-gallon container service, each property owner periodically places a ninety-gallon trash container in his driveway, and the collection company empties the container and hauls away the refuse.
Columbus City Code Section ("C.C.") 1303.06 provides that the Director of Public Service shall collect and dispose of all dead animals and refuse within the city, other than condemned food products. During the 1990s, the city offered five types of refuse collection services, including mechanized ninety-gallon container service and mechanized dumpster service. Of the five types of collection services, mechanized dumpster service is most efficient and least costly for the city.
In November 1995, the four condominium associations applied for city refuse service. Two employees from the city's refuse collection division visited Hilliard Village and Hilliard Commons. They concluded that dumpster service was infeasible and recommended ninety-gallon container service. The city's refuse collection operations manager, however, did not approve the ninety-gallon container recommendation. In March 1997, he informed Hilliard Village that it would need to install dumpsters in order to receive the city's refuse service.
The condominium associations viewed the city's refusal to provide ninety-gallon container service as an effective refusal to provide any service, and they filed the instant law suit. In their complaint, the four associations sought mandamus relief to compel the city to provide refuse collection services and monetary damages for the costs the associations incurred in procuring private collection services. The associations also sought declaratory and injunctive relief under Ohio common law and federal statutory law, and damages for violations of federal constitutional rights.
The parties filed cross-motions for summary judgment, and the trial court granted summary judgment in favor of the city on all claims. On appeal, this court affirmed the trial court's decision on all claims except the claim for mandamus relief. We concluded that there were issues of fact regarding whether the installation of dumpsters would be so costly that it would be infeasible and, thus, the city would be required to provide an alternative form of refuse collection. We concluded that there was evidence in the record regarding the logistics of equipping Hilliard Village and Hilliard Commons with dumpsters, creating a "genuine issue of material fact as to the feasibility of dumpster service at these two communities." State ex rel. HilliardCommons Condominium Assn. v. Columbus (Aug. 17, 1999), Franklin App. No. 98AP-1135, unreported, at 6-7. We noted that there was no specific evidence regarding the feasibility of equipping McNeill Farms or Blendon Park with dumpsters. Id. at 7. We concluded, however, that, because the physical layouts of the communities were similar, the condominium associations provided enough evidence to defeat summary judgment as to all four communities. Id. We therefore remanded the case for a determination of "whether equipping the communities for dumpster service would truly be so costly that it is infeasible and not an option, and, if so, whether the city's refusal to provide a feasible method of collection amounts to a refusal to fulfill its statutory duty." Id. at 6.
On January 28 and 29, 2000, the trial court held a bench trial on the remanded mandamus claim. The following is a summary of the relevant evidence presented at trial.
Craig Bohning, the civil engineer who did the initial engineering drawings for all four sites, provided expert testimony for the condominium associations. Bohning testified that the communities had been designed for curbside trash service, not for dumpsters. He examined the developed sites to determine whether they could be retrofitted for dumpster service, which would involve locating space for an adequate number of dumpsters to meet the capacity needs for the communities. According to Bohning, none of the sites had enough spaces for adequate dumpster placement.
Bohning admitted that he only considered spaces that could readily accommodate dumpsters without any modifications. When he evaluated the McNeill Farms site, he did not, for example, consider any locations that had "[f]ire hydrants, light poles, trees, manholes, electric boxes, gas line markers, anything along that sort of thing that could be considered an obstruction." He excluded from consideration any areas behind the buildings. He excluded all parking areas and any areas that could not be accessed with the current parking configuration. He excluded green spaces. Of the remaining available space, he further took into account the existing slope of the space because the city requires dumpster pads to be built at a thirty-degree angle to the pavement.
On the basis of his evaluation of the space available without any modifications to the development, Bohning concluded that there was room for about eight dumpsters at McNeill Farms. According to his calculations, thirty-three dumpsters are needed to service the McNeill Farms community. In light of the shortfall, Bohning opined that dumpster service at McNeill Farms is infeasible.
On cross-examination, Bohning admitted that the city's expert, Tom DeVoe, had identified ten additional sites at McNeill Farms that, even by Bohning's standards, were viable, unobstructed dumpster sites. Bohning testified, however, that these additional sites were "very spread out," requiring residents to go "an awful long distance to get to the dumpster."
Bohning also admitted that he did not consider whether it would be possible to modify the sites in order to make room for dumpsters in locations that he had discounted:
 Q: What kind of modifications would you find acceptable to consider one potential dumpster site on any of these properties? Is there any type of modification that you would make to an existing structure? A blade of grass? Or a little patch of grass? Would that be acceptable to remove that?
 I was looking at areas where there were not obstructions. You could put in a dumpster location without moving the obstructions with just work around that. That was what criteria I used to determine where the dumpsters go.
He did not, for example, consider altering any of the landscaping:
 How big Or let me put it, how small can a tree be before you will move it to consider that a viable dumpster site? Is there any size that you will have a tree that you will move?
I didn't consider size when I went through my analysis.
 Q: So a one inch maybe two- or four-, five-year old tree that is one inch in diameter would eliminate that site as a possible feasible dumpster site?
A: When I looked at my analysis, that's correct.
Nor did Bohning do any sort of cost analysis to determine either the costs to install dumpsters at the locations that he deemed suitable or the costs to modify the sites to make suitable locations for dumpsters:
 Q: How expensive do you think it would be to install [the dumpsters]? You mentioned on the Blendon Park site there were two areas where they were marked off as possible dumpster sites, initially. And approximately how expensive a job would it be to install dumpster boxes and pads in those areas?
I have not done a cost analysis on that.
So you have no idea what the cost would be?
No, I don't.
 Q. So if I said it was around three hundred thousand dollars to install dumpsters and that would be the cost of the project, what percentage would you say moving a one-inch tree to create a feasible dumpster site, what percentage of the price of that $300,000 project would that tree removal or movement be?
 A. I have not done my cost analysis, so I would have to take some numbers and determine what your criteria would be to be able to pick out what that percentage would be.
 Q. You have no idea about the cost of a two-inch tree removal, or let's say, hauling away a mound of dirt, how much would that cost relative to a project of, say, $300,000 to install adequate number of dumpsters to serve this project?
 A. It's kind of an open question. It would be very difficult for me to say how much it would be. It depends on the site and how you would grade it and what the intent would be. I would need to do an analysis.
Although he was unprepared to quantify the expense, Bohning admitted that, with some unknown expenditure, the communities could install enough dumpsters to meet their refuse collection needs:
 Q. And if you also assume that removing a mailbox or not removing but just moving it over a few feet or into a different location was acceptable to install dumpsters, would that also open up some more dumpster spaces at all of these properties?
 A. You can throw enough money at this that you can move whatever you want and fit it wherever you want. From a practical standpoint, obviously not between buildings where there is not enough room. If you take all of the obstructions out, yeah, you can fit enough dumpsters if you relocate all of the trees and mailboxes and such.
Cecil Stallings, the division manager of the city's refuse division, testified that he visited the Hilliard Village and Hilliard Commons communities in 1995. Based on his visual inspection, Stallings concluded that dumpsters were not a feasible method for refuse collection. Stallings concluded that it would be easier to continue using ninety-gallon container collection because of the tight design of the communities, and he made this recommendation to his supervisor.
Albert Wofford, the city's refuse collection supervisor in charge of dumpsters, visited the Hilliard Village and Hilliard Commons communities in 1997. Wofford also recommended ninety-gallon container refuse collection. In the wake of his inspection, he noted in a memorandum that "[t]his area is set up in a way it would be very costly to have front dumpster collection. They will also lose a lot of parking."
Neither Stallings nor Wofford offered any evidence as to McNeill Farms.
Tom DeVoe, Jerry Edwards, Joe Girard and Robert Scott, all civil engineers and city employees, provided expert testimony on behalf of the city. DeVoe opined that dumpsters of adequate capacity could be installed at all four communities without making major modifications, although he conceded that "a couple" fairly small trees and "a couple" light poles might have to be moved. As for McNeill Farms, DeVoe testified that twenty-nine dumpsters would be required to service the community, and he was able to identify fifty-four potential dumpster sites. DeVoe admitted that he had not taken into account the spacing of dumpsters relative to the units.
Jerry Edwards testified that refuse trucks would be able to negotiate the streets in each of the communities to service dumpsters. Joe Girard, who likewise opined that the installation of dumpsters was feasible at all four communities, also testified about costs. According to Girard, the costs to retrofit these communities for dumpsters by installing dumpster pads and fences would not be significantly higher than the cost had the communities been initially constructed for dumpster service. He estimated that each community would have to haul away one truckload of dirt, and he testified that the cost for dirt removal would "[not be] a major item." Girard estimated that it would cost $3,355 to install each dumpster. Overall, he estimated that the cost of fitting all four communities for dumpsters would amount to $440,000, a cost that he characterized as "pretty average."
Robert Scott, who also opined that dumpster service was feasible, provided the only other evidence as to the costliness of installing dumpsters. He estimated that installation would cost between $2,652 and $3,452 per dumpster. He opined that, in terms of costs, the installation of dumpster pads would be in line with similar-type residential developments. He testified that the condominium associations would recoup the costs of installing dumpsters after three years of receiving the city's refuse collection services.
Based at least in part on its determination that the city's dumpster plans for the communities did not take into account the distance between dumpsters, the trial court concluded that installation of dumpsters at the four communities would be infeasible. The court granted the writ of mandamus, ordering the city to provide ninety-gallon container service to each of the communities, and it awarded monetary damages to compensate the condominium associations for the costs of their private refuse collection services. The city filed the instant appeal. While this appeal was pending, the appeals as to Hilliard Village, Hilliard Commons and Blendon Park condominium associations were dismissed. At issue in this appeal, therefore, is only the trial court's judgment with respect to McNeill Farms.
The city asserts the following assignments of error:
FIRST ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN FAILING TO FOLLOW THE MANDATE OF THE COURT OF APPEALS.
 SECOND ASSIGNMENT OF ERROR
 IN DETERMINING DUMPSTER FEASIBILITY, THE TRIAL COURT ERRED AS A MATTER OF LAW IN NOT APPLYING THE CONTROLLING RELEVANT COLUMBUS CITY CODE CHAPTER THIRTEEN (REFUSE CODE), WHICH CONTAINS PROVISIONS FOR DUMPSTER CAPACITY REQUIREMENTS BUT CONTAINS NO DUMPSTER LOCATION OR SPACING REQUIRMENTS.
 THIRD ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN ALLOWING AND CONSIDERING IRRELEVANT AND PREJUDICIAL EVIDENCE, OVER OBJECTION AND WITHOUT REGARD TO THE CONTROLLING REFUSE CODE, CONCERNING THE LOCATION OR SPACING OF DUMPSTERS IN ITS DETERMINATION OF DUMPSTERS INFEASIABILITY.
 FOURTH ASSIGNMENT OF ERROR
 THE TRIAL COURT'S ERRONEOUS DETERMINATION THAT DUMPSTERS ARE INFEASIBLE, AS A MATTER OF LAW AND TO THE PREJUCIDE AND DETRIMENT OF THE APPELLANTS, IS WHOLLY UNSUPPORTED BY ANY SUFFICIENT COMPETENT EVIDENCE OR TESTIMONY IN THE RECORD REGARDING THE COST OF EQUIPPING THE PROPERTIES WITH DUMPSTERS THAT WOULD AUTHORIZE OR SUSTAIN THE TRIAL COURT'S JUDGMENT.
 FIFTH ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN APPLYING ORC CHAPTER 2731 IN GRANTING A WRIT OF MANDAMUS.
 SIXTH ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN AWARDING EXCESSIVE DAMAGES WITHOUT TAKING INTO ACCOUNT AND PRORATING FOR FEASIBLE POTENTIAL DUMPSTER SITES DEMONSTRATED BY THE CITY AND CONCEDED BY APPELLEES.
For the reasons that follow, we reverse the judgment of the trial court and enter judgment in favor of the city of Columbus.
In order to be entitled to a writ of mandamus, a relator must establish: 1) that he has a clear legal right to the relief requested; 2) that the respondent is under a clear legal duty to perform the requested act; and 3) that he has no plain and adequate remedy in the ordinary course of law. State ex rel. Ney v. Neihaus (1987),33 Ohio St.3d 118, 118-119. "The facts submitted and the proof produced must be plain, clear, and convincing before a court is justified in using the strong arm of the law by way of granting the writ [of mandamus]."State ex rel. Pressley v. Indus. Comm. (1967), 11 Ohio St.2d 141, 161.
The issuance of a writ of mandamus is committed to the sound discretion of the trial court. On appeal, "we must determine whether the trial court, on the merits of the case, abused its discretion in granting the writ." Mate v. Stow Bd. of Edn. (1988), 62 Ohio App.3d 265, 267. "`The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. However, "[w]hether there is any evidence to support a decision is a question of law. When a decision is challenged as being unsupported by any evidence, the court will carefully consider the entire record to decide whether there is any evidence to support a decision. A determination that there is a complete lack of evidence to support a finding does not involve a weighing of the evidence." (Emphasis sic.)Christenson v. Mt. Carmel Health (1996), 112 Ohio App.3d 161, 168-169
(citations omitted).
Ohio law authorizes a writ of mandamus to enforce compliance with a public duty. A court may issue a writ of mandamus to command "the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." R.C. 2731.01. In the instant action, the city has an undisputed duty, pursuant to C.C. 1303.06, to "collect and dispose of * * * all dead animals and refuse within the City." At issue in this action is whether the city has fulfilled it public duty by offering to collect and dispose of refuse at McNeill Farms through dumpster service. If dumpster service fulfills the city's duty, a writ of mandamus compelling an alternative method of refuse collection, one which would be more costly for the city to implement, would be unjustified.
We address the city's first, fourth and fifth assignments of error together, as they are related. In its first assignment of error, the city argues that the trial court failed to follow the remand mandate of this court to determine whether dumpsters would truly be so costly that they would be infeasible. By its fourth assignment of error, the city contends that, because there was no competent evidence at trial as to the costliness of dumpsters, the trial court erred in determining that dumpsters would be infeasible. Consequently, the city argues in its fifth assignment of error, that the trial court erred in granting the writ of mandamus.
In our prior opinion on this case, we reached the following conclusion:
 The determinative issue under appellants' request for a writ of mandamus is whether appellees have failed to honor their duty to collect refuse. Resolution of this issue necessitates determining whether equipping the communities for dumpster service would truly be so costly that it is infeasible and not an option, and, if so, whether the city's refusal to provide a feasible method of collection amounts to a refusal to fulfill its statutory duty. * * * [State ex rel. Hilliard Commons Condominium Assn., at 6.]
By this statement, we clearly indicated to the parties and the trial court that, upon remand, the court was to resolve the factual dispute of whether installing dumpsters would be so costly that dumpster service would be infeasible.
Pursuant to the doctrine of the law of the case, "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." Nolan v. Nolan (1984), 11 Ohio St.3d 1, 3. "[T]he doctrine functions to compel trial courts to follow the mandates of reviewing courts." Id. The city argues that McNeill Farms and the trial court failed to follow the mandate from this court. We agree.
McNeill Farms provided no evidence whatsoever regarding the cost of equipping the community for dumpster service. McNeill Farms' expert witness, Craig Bohning, testified that he only considered placing dumpsters on sites that could accommodate dumpsters without any physical modifications. He admitted that an adequate number of dumpsters could be placed on the site if McNeill Farms committed "enough money" to move obstacles, but he was not prepared to estimate the costs for making any modifications. In contrast, the city provided expert testimony that McNeill Farms could be retrofitted with dumpsters at a cost that would not significantly exceed the cost had the project been initially designed for dumpster service.
McNeill Farms argues that the testimony from Cecil Stallings and Albert Wofford provided adequate evidence for the court to find that it would be infeasible for McNeill Farms to install dumpsters. We do not agree that the testimony from Stallings or Wofford satisfies this court's mandate, particularly with respect to McNeill Farms. Stallings and Wofford did not inspect the McNeill Farms community. Rather, their inspections were limited to Hilliard Village and Hillard Commons. Although the four communities have similar physical layouts, testimony demonstrated that there are significant differences. Even Craig Bohning, for example, identified a different number of unobstructed dumpster sites at each of the four communities. Stallings and Wofford's testimony about the feasibility of dumpster service at Hilliard Village and Hilliard Commons, therefore, is not instructive on the situation at McNeill Farms. Nor did Stallings or Wofford provide any evidence about the possibility of modifying the McNeill Farms site in order to accommodate dumpsters or the costs associated with such modifications.
McNeill Farms also cites to testimony from the city's expert, Joe Girard, that it would cost $440,000 to equip all four communities with dumpsters. According to McNeill Farms, this cost is "hardly an insignificant price tag for service provided to other taxpayers free of charge." McNeill Farms argues that this testimony allowed the trial court to determine that dumpsters would be too costly to be feasible. We disagree.
The undisputed evidence established that the condominium community, and not the city, is responsible for equipping the community for dumpsters. The service provided by the city is refuse collection; the city does not install dumpster pads or fences. Moreover, Girard testified that $440,000 would be a "pretty average" cost to equip these communities. McNeill Farms' argument defies reason, for if the average expense for installing dumpster pads and fences is too costly to make dumpster service feasible, dumpster services would never be a feasible means of refuse collection. Considered in context, Girard's testimony does not demonstrate that dumpsters would be so costly that they would be infeasible.
We conclude that McNeill Farms failed to offer any evidence that would demonstrate the cost of installing dumpsters at McNeill Farms. Without any evidence as to cost, the trial court failed to follow the mandate from this court to determine whether dumpsters would be so costly that they would be infeasible, therefore, the writ of mandamus is improper. We therefore sustain the city's first, fourth and fifth assignments of error.
Given our disposition of the city's first, fourth and fifth assignments of error, the city's second, third and sixth assignments of error are overruled as moot. See App.R. 12(A)(1)(c).
For the foregoing reasons, the judgment of the Franklin County Court of Common Pleas is reversed.
PETREE and KENNEDY, JJ., concur.